which is Ali v. the District Director of the Miami District, U.S. Citizenship and Immigration Services. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the court, Anis Saleh for Appellant Ghiass Ali. Your Honors, this is a rather simple case, both factually and legally, while at the same time it's a very, very unique case and an important case. And in this case, the law is clear and so are the facts and the evidence. We respectfully believe that the district court's decision is just simply wrong. And we're asking this court to find that Mr. Ali met his burden of proof by a preponderance of the evidence that he has satisfied all the requirements to be naturalized as a U.S. citizen. We believe the court erred in many different ways, and in particular in finding that Mr. Ali had not testified or providing any evidence regarding the notification process or procedures utilized by the Syrian government in 1984. Mr. Ali testified in great detail about the procedures in terms of getting his initial non-diplomatic position and his subsequent diplomatic position. And his testimony was unrefuted, unimpeached, and unrebutted. And in fact, the evidence he provided is consistent with that testimony. In addition— Testimony about whether or not or when he was afforded diplomatic immunities and privileges? Correct. He testified as to why he left the United States on November 16, 1984. That was to apply—to first take a course which, if he passed, would allow him to apply for a diplomatic position. My understanding is what matters is what the Department of State says and not what anyone else says, including the government of Serbia. Why am I wrong about that? Well, it's not what the Department of State says. It's when the Department of State received official notification from the Syrian government that Mr. Ali had become a diplomat. And Mr. Segros, the acting director and deputy director of the Office of Foreign Ministries, stated that the official records of the Office of Foreign Missions indicated that he assumed his duties as a diplomatic agent on November 6, 1984. That's correct, Mr. Segros. That's what the Department of State says. Correct. Well, Mr. Segros also testified that he was looking at a computer screen that told him that. He didn't know when that date was entered, who entered it, or how it was entered, or what evidence was used to enter that date. Essentially, he just read off a screen, and I said, I certify that my screen says X. So he knew as much about that date as his gardener or his housekeeper does. He's just reading off a screen. And he testified that there are three— So what you're telling us, what controls, is not what the Department of State says but what Mr. Ali says. No. What controls is the evidence in this case. And here's what the evidence says because Mr. Segros said when a person is in the United States and they're changing from a non-diplomatic to diplomatic status, there are three separate things that can occur. One is the Department of State receives an official notification of appointment by the foreign government, in this case Syria, notifying the Department of State, hey, Mr. Ali is becoming a diplomat. That document, nonexistent. Counsel, let me ask you this. Yes. Before you talk about the evidence, let's step back a minute and let me ask you if you can point us to any case law that supports the conclusion that the State Department's certification of diplomatic immunity should be treated as anything less than conclusive. Because Segros has given that. So before we even look at the evidence, what case law supports the conclusion that we should look at the evidence, that we shouldn't simply accept the State Department statement as conclusive? Your Honor, there's no case law on point specifically saying that. But what the case law says, in the absence of indicia that the information is unreliable, it must be accepted as reliable. And in this case, Mr. Ali has provided evidence that the information is not reliable. And that evidence is the absence of the three only documents that Mr. Segros said should be in the record. Those three don't exist. The government has conceded they don't exist. What document would normally the State Department point to to establish that a diplomat was in fact afforded diplomatic immunity? What do they usually point to? Your Honor, according to the State Department, there's three separate documents. There's an official notification from the Syrian government to the Department of State saying we're appointing this gentleman as a diplomat. That's option one. Doesn't exist. Option two is a notification of change, meaning this individual is now a non- Doesn't answer the question, doesn't it? Doesn't the State Department have the power to say thank you very much to the government of Syria? We're not affording him diplomatic immunity. Correct. That's the prerogative of the United States Department of State. Isn't that right? That's correct. But the mere fact that the foreign government seeks diplomatic immunity for someone doesn't establish that he has been given the immunity. That's correct, Your Honor. So what I'm asking is what does the State Department normally say when it's afforded diplomatic immunity? Typically they will accord diplomatic immunity unless there's evidence to the contrary or they don't want to. But how do they do it? They say here's a document. He's got diplomatic immunity, and they send it to the Syrian government? No, it's the other way around. Or they stick it in their file? What do they do? It's the other way around. The Syrian government sends a document to the State Department saying we want to make this guy a diplomat, and the State Department receives that document and decides whether or not to accord the immunity to this guy. So what is the means by which they record that decision? They're supposed to record it on a notification of change, notification of appointment, or diplomatic note, neither of which exist in this case. That's my point. And under the Vienna Convention, there's two separate ways diplomatic immunity attaches. Okay, so assuming you're right that that stuff isn't in the record. If conceded, it's not in the record. Bear with me. The district judge then said, okay, I'm denying summary judgment. Let's have a hearing. You can put on your evidence, including your client. The State Department will put on what they want, and I'll decide based on this evidence whether you've established your burden and the burden plainly rests with you. Having said that, the district judge cites to at least three things in rendering her conclusion that he was afforded diplomatic immunity on November 6th before the daughter was born. One, the State Department's TOMAS database, which represents the official record with respect to diplomatic immunity maintained by the Department of State, and that says that Ali had diplomatic immunity as of November 6, 1984. The second item was the handwritten notation on the November 6th of termination, which maybe is insufficient standing alone to qualify as proper notification, but she cites to that as corroborative evidence, if I have it right. And third, the State Department has consistently determined that the daughter is not a U.S. citizen going as far back as 1985. She references that, and she concludes that he was afforded diplomatic immunity as of November 6th. Whether it's an irrebuttable presumption or not, she says based on these facts, that's my finding. One, is that reviewable only for clear error? And if it is, have you shown that she wasn't free to reject your client's account and accept these data to reach that conclusion? First of all, we believe, Your Honor, it's a mixed question of fact and law, okay, which is under the de novo standard. Number two, as far as each and every one, I will address those. The Tomas database, again. It's a mixed question of fact and law, whether, bear with me, whether this, help me with this, whether the State Department has afforded diplomatic immunity to a foreign diplomat. That's not a question of fact. It's a mixed question. Well, it's a mixed question in the sense that did they follow the procedures that were required to do that, and if so, you know. I think that's plainly a legal question, but I'm asking a different question than what procedures they employed. I'm asking whether or not a finding by a trial court judge after taking testimony at a bench trial that Jones was afforded diplomatic immunity as of this date. Isn't that a finding of fact? That is a finding of fact. Does she make that finding of fact in this case? Yes, premised on the conclusion of law. It's premised on the conclusion of law, and the conclusion of law was that despite the fact that it didn't follow any of the procedures that are required, despite the fact that they violated their regulations, despite the fact that the evidence doesn't exist, she still found that. She means by your theory, you were entitled to summary judgment as a matter of law. No, I don't agree with that. And the evidence would have been irrelevant that they put on? I don't agree with that because I provided separate evidence, which is when he got his A-1 visa, how he got the A-1 visa, both and how he entered with the A-1 visa, all of which took place after the child's birth, and which are consistent with the second prong of the Vienna Convention, which talk about individuals who are abroad and in which diplomatic immunity attaches once they enter. His story, his version of the facts, the evidence he presented is entirely consistent with the other prong of the Vienna Convention, and their version of facts is entirely inconsistent because none of the evidence they should have and should be in the file is there. They have the evidence before. They have the evidence after. But the most important critical piece of evidence that's supposed to exist that would show a change in the United States doesn't exist. How is that possible? Counsel, the district judge accepted your premise. She didn't consider the certification by the State Department to be conclusive. She accepted your presence that there was indicia of unreliability and that she should take evidence, and then she took evidence, and then she made a factual finding about whether or not he had diplomatic immunity. I don't see where the question of law is there. I see that as a finding of fact by the district judge. And assuming, Your Honor, that it is a pure finding of fact, we believe she committed clear error in making that finding of fact because it belies common sense as to what took place. Yes, in naturalization applications, the doubts are supposed to be resolved in favor of the government, but you can't put aside common sense and say, well, and having to require the plaintiff to rebut every single potential possibility that exists that may be out there. The State Department made the exact same conclusion way back in 1985. Correct. Isn't that strong evidence that he did have diplomatic immunity only a year earlier? The conclusion in 1985, and I can refer you to the exhibit, Your Honor. It's – It would be in the supplemental appendix filed by the government. It would be Petitioner's Joint Exhibit F, which is the passport application from 1985. Your Honor, and there was much discussion in court about that. They denied her application because they said she was on the blue list as of November of 1984. That's handwritten on the application. The blue list is the list of diplomats. Well, the government has conceded that – they said that Mr. Ali was on the blue list as of November of 1984. They've conceded now that he wasn't on the blue list on November of 1984. So if you look at the basis for this denial that he was on the blue list back then, they've now conceded that he wasn't on the blue list back then. So this denial was wrong based upon when it was issued. When you started your argument, you said there's a missing document. Correct. What document would that be? The document – So that I can ask Mr. Carrillo about that when he comes up. Correct. Your Honor, it's one of the three documents that Mr. Segros testified would exist if Mr. Ali had changed from a non-diplomatic to diplomatic status while in the U.S. Either a notification of change – How do you refer to that? What kind of document? Either a notification of change, a notification of – This is a State Department document. It's a – yes, that a foreign consulate fills out, a foreign embassy fills out and sends it to the State Department. It's a U.S. government form that – I'm asking about a State Department document. Correct. It is a State Department document. Okay. All right. And notification of change, notification of appointment, or diplomatic note. And the government, at Appendix 99, page 36, lines 10 through page 37, line 4, conceded that none of those three documents exist. And one of the documents they have is the notification of termination from his non-diplomatic position. And they're saying in that morning he was terminated, in that afternoon he was appointed, but the appointment document doesn't exist. They're relying on this little handwritten note. We don't know when it was written, by who, and why. And they concede that that little handwritten note is not an official notification and is not consistent with the regulations. Thank you, Your Honor. Thank you, and you have reserved your rebuttal time, Counsel. Thank you. Good morning. If it pleases the Court, my name is Joseph Correlia on behalf of appellees. The government asks that the Court uphold the decision of the lower court that the appellant did not meet his burden and that he met all statutory requirements for naturalization. I think this is a clear, factual question, and it was whether the United States afforded Mr. Early full diplomatic immunities and privileges. Is there an official State Department document that would resolve the matter conclusively that's not in the record in this case that's missing? It says there's a notification of change. Your Honor, if I could clarify what the appellant's counsel was referring to and what Mr. Segaros was referring to in his testimony. When a sending state notifies the receiving state, and in this case these are the procedures then the United States as a receiving state uses, at the time in 1984 it used a DS-394, which was a notification of appointment, a DS-394A, which was a notification of termination, or they would accept a diplomatic note, which is essentially a written correspondence between the sending state and the receiving states. That's how the Department of State would receive information from a sending state on when an individual, what their position was in the mission, and therefore based on their position would make a determination as to whether they are considered. After that. In the official State Department record, which is in the evidence in this case, is the certification that is provided by the State Department. That certification is based off of the official U.S. government record, which is the Tomas database. I thought Mr. Segaros testified that I have examined the official record and this is what the official records state. Yes, and those official records are the Tomas database. And that's what was admitted into evidence in the case? Yes, the Tomas database was admitted in there, and that is in Respondents Exhibit 3. Okay. And the Department of State has... Is it possible that the date that the foreign country tells the State Department that the person assumes his or her duties may not necessarily line up with the actual date that the person starts? Is that possible? The State Department, when they accept it and they basically certify somebody on that date, that's the date that the individual is afforded privileges and immunities. And so even if they're in the State Department, even if there is an error with that date, that's the date that the State Department has accredited the individual. I'm still confused about the procedures. Maybe you can help me. When a foreign government says to the United States, Jones is going over to D.C., he's going to work in our embassy, he's a diplomat, afford him diplomatic immunity, that doesn't afford him diplomatic immunity, right? The State Department has to say, amen, we'll do it. Yes, sir. Right? What I want to know, and I think it's the essential question that Judge Wilson is asking, is what document or documents record that decision by the Department of State? The document that records that decision is the TOMAS database. That is the recordation of that decision. That's it? There's nothing else? I thought that there was something else. Maybe I misunderstood this. So you would look to the TOMAS database as the singular guide to whether or not the Department of State has certified he's got diplomatic immunity? Yes, that is the official government record of when diplomatic immunity was afforded. Okay, and if you look at the TOMAS record here, it says he had immunity as of November 6th. Yes, Your Honor. And what was the reason for a hearing? Is that irrebuttable? Normally courts should find that a certification based off of the TOMAS database should be accepted as binding on summary judgment because the government was the moving party. The district court at that time determined that it was not binding and that she could look behind it. I think that the government has consistently – Is that a legal error? The government has consistently said that that certification should be accepted as binding on the courts. And we believe that that was an error by the district court judge. So if the Department of State puts in a TOMAS database, we record that Jones is afforded diplomatic immunity on January 1, 2017. And in fact, Jones had been here for five years as the deputy ambassador from a foreign government. The district court would not be able to go behind the statement in TOMAS and look to see whether that's right or wrong? The federal court has no power to review anything beyond asking a single question whether the TOMAS base records that date. Well, I think that would depend on what type of evidence is produced that the sending state had notified the United States. It would be irrebuttable if the TOMAS base constitutes the certification and the TOMAS base is unreviewable by a court of law, notwithstanding whatever other evidence there is. That's the end of it, and the court has performed its function of judicial review simply to ask, what does the TOMA base reflect? Well, it's what is in the certification. That is the certification. You're telling me the TOMA base is the mechanism of recording. Yes. And if the TOMA base says, aye, on this date, that's the end of it? The district court can do no more, look no further, regardless of what evidence is mounted that suggests maybe the TOMA base made a mistake. I think that the certification should be binding on the court, yes. So if there's a clerical error in entering it into a database, that's unreviewable by a court? When you say a clerical error, I mean, you pose a hypothetical. They got the wrong date. They put down January 1, 17 when they should have put down January 1, 2012. See, I thought what the trial judge was trying to say here is the record was murky. It was unclear. She was not required to accept Ipsy-Dixit, the assertion by the State Department, when there was contrary evidence cut the other way. Therefore, she said, all right, we'll have a hearing. Put on what you got, put on what you got, and I'll decide. Yes, Your Honor. But if I hear what you're – that's what she did. But I'm simply asking, was she wrong in doing that? Was she obliged to give final judgment based simply on the statement in the database, Thomas? Consistent with the other case law that, yes, that the Department of State certification was binding on the court. Regardless of anything else that might be there. Do those cases say that's conclusive? You can't look at anything else? I think that those cases have held that that certification is binding on the courts. What does that mean? That it should accept the certification on its face. As conclusive. As conclusive. Got it. Even though the information may have been migrated to the database by the data clerk at a different time? Yes. I mean, in this case, what we have is we have evidence of data migration. But we have a database that clearly reflects November 6th. We have the dates that that information was entered. And there is no evidence presented that the migration, that anything occurred in the migration other than the data went from one database to another database. And that a data clerk entering information, that there was any evidence that that data clerk committed any errors in entering that – in entering the information into the database. Let me understand the procedures. What role does the notification of change play in recording the determination by the State Department that someone has afforded diplomatic immunity? So if upon – and we'll say the notification of change, it will normally come potentially at that point in time in a notification of termination. The notification of termination would be taken in by an accreditation officer at the Department of State. And they would go in and make the appropriate changes. That would be in the Foreign Council? No. That would be in Washington. So it would be in Washington. So a sending state would send a notification of termination and a notification of appointment on an individual who works at their mission to – or they could also do it via diplomatic note to inform – The difference between the notification of change and the notification of appointment, are those two separate documents? There are three different forms of communication at the time. A DS-394, which is a notification of appointment. A DS-394A, which is a notification of termination. Or a diplomatic note. And what happens? How does this get recorded on the TOMAS database? So in 1984, that information went from a sending state to the receiving state to the Department of State and an accreditation officer would receive that information, verify the contents, and then enter the information into the TOMAS database. The information would be what appears on the notification of appointment, the DS-394, as well as the termination, 394A? Right. Both of those things would go into the base? What would go into the database would be the information that's contained in there. In other words, if a position was – if an individual is being terminated from a mission, it would indicate the date that the individual terminated. If it was going to be a termination and then a subsequent appointment, in other words there had been a change in the individual's position, it would record the termination under that position and then record the new position. Isn't the better evidence the 394 and the 394A rather than the TOMAS base? Because that's a derivative of the former? No, because the official government record is the TOMAS database. Then let me come back to my clerical error question. Somebody inputs it into the base. Who does that? At the time, it was an accreditation officer. At the time of the migration, we have – we don't know. I mean in the normal course of a business, who from the Department of State makes the entry into the TOMAS base that reflects the composite of the notification of appointment and termination or the diplomatic note? At the time, it's an accreditation. I keep saying at the time because now in the present, all of this is done electronically. It's done electronically unless a sending state decides that they want to do it via diplomatic note where a sending state nowadays goes into basically a public-facing website that they have access to. They will enter the information into that webpage. It will then populate the information into the Department of State's database. Let me come at my question this way just so I get it right. There's a thing called a notification of appointment. It's a Department of State Form 394. Is that generally handwritten? I mean there's a physical document? It depends on what the – Or it could be electronically? Now that information is transmitted electronically. In 1984, it was a hard copy document that was either typed written, handwritten, that was communicated to the Department of State. That would be one indicia of affording diplomatic immunity, right? That would be not affording diplomatic immunity. That would be a communication from a sending state to the United States. So what reflects that you've actually agreed to give diplomatic immunity to somebody? The TOMAS database is the record of when the United States afforded someone diplomatic immunity. So what does it say? We hereby give you diplomatic immunity? No, it is an entry in the database. That is the record. What does the entry say? It will record the date that the individual started their position, the name of the individual's position, and it has other information. I mean the TOMAS database is Respondents Exhibit 3 in the record, and you can see what that information is. But that is the record. I think what you're looking for, Your Honor, is how does the United States then transmit to a sending state that in fact they have afforded diplomatic immunity. But that's not the record that the – No, I understand that. I understand. The response to them is different from when you record it yourself. You record it in the database. Supposedly, coming back to what I was asking, suppose the clerk makes a mistake. A mistake in the entry. They just get the date wrong. And let's suppose the foreign sovereign didn't do it electronically, but they did it with a handwritten note, and the entry date is erroneously recorded in the database. Is that reviewable by a court? I'm not saying that's what happened here. I just want to know, as a matter of law, whether the beginning and the end of the story is simply looking at the TOMAS base or whether a court performing the function of judicial review can go behind that in an appropriate case. I think the question is, when you say the TOMAS database, what I'm saying should be binding on the court is the certification by the Department of State as to those are the dates that the individual has afforded diplomatic immunity. So not Respondent's Exhibit 3, the TOMAS database, but it's Respondent's Exhibit 2, the DOS certification, that the Department of State has looked at the official government records that exist for the time and have said this is the dates that the individual has afforded diplomatic immunity. Thank you. Thank you very much. Your Honors, the government is changing their story. Mr. Segrove said notification of change, notification of appointment, diplomatic note. Now Mr. Carilli is saying that a notice of termination is suddenly morphed into a notice of appointment, when on the record Mr. Carilli admitted. Didn't Segrove testify that the definitive State Department record on the diplomatic status of a foreign emissary is the TOMAS database? I thought he said that at 56 and 57 of his testimony. He did say that, but that's based upon a data clerk, as testified by the Department of State IT guy, that a data clerk entered into based upon a notification of change, appointment, or diplomatic note, none of which exist in this case. In other words, you have the paper. Back then you had the paper going back and forth. Then they took what's on the paper and supposedly put it into a database. So if what was on the paper and what we have today, and if we look at exhibit joint exhibit D, which is when they first notified the State Department that Mr. Ali was becoming into a non-diplomatic position. You have that document from 1981. You have joint exhibit E, which is the termination from his non-diplomatic position. It just says on the right-hand side promoted to attache. It doesn't say when. It doesn't say who wrote it. So presumably a data clerk looked at that and entered November 6. It doesn't mean it occurred on November 6. We don't know who wrote it. And Mr. Segrove can't even authenticate the contents of the database. He was 10 years old at the time. So all he's doing is authenticating what he sees on a computer screen. And if the evidence doesn't make sense in light of what's on the computer screen, if all the evidence Mr. Ali has presented, including when he got the visa and how he got the visa, contradicts that, and if he's truly promoted to attache on November 6, then right next to that joint exhibit E would be a notice of change or notice of appointment as a diplomat. That document doesn't exist, but it supposedly took place on the same exact day. Why would they send a notice of termination and not at the same time send a notice of appointment? It belies common sense. The judge found three things to sustain her decision, that the Tomis database was reliable. Well, we have evidence countervailing that. That it's not necessarily reliable because the facts in this case as testified by Mr. Ali and when he got the visa completely contradict that and are consistent with the Vienna Convention. The handwritten notation which the government has conceded isn't a diplomatic note and doesn't constitute a diplomatic immunity or a request for diplomatic immunity. And the denial of her passport application, of Sablo's passport application, 85, based upon Mr. Ali being on the blue list in November of 84, and then the State Department has conceded that he wasn't on the blue list in November of 84, and that was a mistake. So if you look at all these things in totality, and as Mr. Curley said, when you ask Judge Marcus, is there any type of review a federal court can do to look behind the Tomis database, he says, it depends on what type of evidence the sending states sent. And in this case, there is no evidence of what the sending states did. It doesn't exist because it didn't happen the way they say it happened. It happened the way Mr. Ali said it happened, and that's corroborated not by theory but by fact. And the fact is he left for a month, took a test, passed it, got his visa, his A1 diplomatic visa, the first ever that he's ever gotten, after the child was born and entered four days after that, also after the child was born. That's what happened, and that's consistent with the Vienna Convention. Exactly what it says for someone who's outside the country as to when diplomatic immunity attaches. Thank you, Your Honor. Thank you, counsel. Thank you both. This court will be in recess until 9 a.m. tomorrow morning.